UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| JOHN DOE, by and through his Parents and next friends, Mr. & Mrs. Robert Doe; and MR. ROBERT DOE; MRS. ROBERT DOE, <br>     *Plaintiffs*, <br>     *v.* <br> DARIEN BOARD OF EDUCATION, TOWN OF DARIEN, ZACHARY HASAK, ROBIN PAVIA, MELISSA BELLINO, ANDREA CUNHA, and LAURA CONTE, <br>     *Defendants*. | Civil No. 3:11cv1581 (JBA) <br><br> May 21, 2015 |

**RULING ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

John Doe and his parents Mr. and Mrs. Robert Doe, bring this suit against the Darien Board of Education ("BOE"), the Town of Darien, Zachary Hasak, Robin Pavia, Melissa Bellino, Andrea Cunha, and Laura Conte, alleging violations of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12132 *et seq.* and § 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794 (as to the BOE only) (Count I); Title IX, 20 U.S.C. § 1681(a) (as to the BOE only) (Count II); substantive due process as guaranteed by the Fourteenth Amendment of the United States Constitution (as to all Defendants except the Town) (Count III); procedural due process as guaranteed by the Fourteenth Amendment (as to the BOE) (Count IV); assault and battery (as to Mr. Hasak) (Count V); reckless and wanton conduct (as to Mr. Hasak) (Count VI); and negligence (as to all Defendants except the Town) (Count VII); and further alleging that the Town and Board of Education must indemnify their employees (Counts VIII and IX). Plaintiffs' suit arises out of allegations by John Doe that he was sexually abused by his paraprofessional aide,

1

Zachary Hasak, while in school on one or more occasions prior to October 15, 2009. Defendants (with the exception of Mr. Hasak) bring this motion [Doc. # 326] for summary judgment seeking judgment in their favor on Counts I, II, III, IV, VII, VIII and IX. Oral argument was held on March 17, 2015. For the following reasons, Defendants' motion is granted in part and denied in part.

## I.  Background

On October 15, 2009, Plaintiff John Doe, a then-twelve-year old boy with Down Syndrome, told his father, Plaintiff Robert Doe, and subsequently his mother, Plaintiff Mrs. Doe that his paraprofessional aide, Defendant Zachary Hasak, had taken out his penis and told John to touch it. (Mr. Doe Dep., Ex. O to Pls.' Loc. R. 56(a)2 Stmt. [Doc. # 334] at 67; Mrs. Doe Dep., Ex. F to Defs.' Loc. R. 56(a)1 Stmt. [Doc. # 327] at 92.) The Does sent John to school and immediately called Dr. Eileen Luddy, the independent educational consultant paid by the BOE to assist in creating and implementing John's Individualized Educational Plan ("IEP"). (Mrs. Doe Dep. at 92.) Dr. Luddy called MaryLee Fisher, then-principal of John's school, Tokeneke Elementary School and told her that she and the Does needed to meet with Ms. Fisher and then-Assistant Superintendent of Schools for Darien Dr. Stephen Falcone. (Luddy Dep., Substitute Ex. G to Defs.' 56(a)1 [Doc. # 337-1] at 192–93.) Ms. Fisher instructed Speech Pathologist Sue Atkinson to stay with John and Mr. Hasak so that John would not be alone with Mr. Hasak (Atkinson Dep., Ex. C to Defs.' 56(a)1 at 84–85), and then she met with Dr. Luddy, the Does, and Dr. Falcone to discuss next steps (Luddy Dep. at 192–93). Directly after that meeting, Dr. Falcone notified Mr. Hasak that he would be on paid administrative

leave pending the results of Dr. Falcone's investigation.  (Falcone Dep. Vol. I, Ex. E to Pls.' 56(a)2 at 66.)

Assistant Principal Kathy Schultz, Dr. Luddy, and Ms. Atkinson interviewed John about what had happened.  (Mrs. Doe Dep., Ex. I to Pl.'s 56(a)2 at 127.)  Although the Does were assured that the interview would be video-taped, it was not.[1] (*Id.*; Falcone Dep. Vol. I, at 72–73.)  Instead, Sue Atkinson took notes which were typed up several days later.  (*See* Notes of 10/15 mtg, Ex. AA to Pls.' 56(a)2; Atkinson Stmt. to Police, Ex. MM to Pls.' 56(a)2 at 2.)  According to the notes, during the interview John told Ms. Schultz that he touched Mr. Hasak's "peeper" and that it made him feel upset and "really mad." (*Id.*)  The Does reported the incident to the Darien Police Department later that day. (Mr. Doe Dep. at 103; *see* Police Report, Ex. X to Pls.' 56(a)2.)  The school notified the Department of Children and Families ("DCF").  (Police Report at 5.)  A Sexual Assault Response Team ("SART") interview was arranged for October 21, 2009, to be conducted by the Stamford Child Guidance Center in conjunction with the Darien Police Department and the BOE.  (DCF Dec. 2009 Report at 5.)

During the SART interview, John told Ms. Schultz and forensic interviewer Carol Smith-Harker that while he was in room 213 at school with Mr. Hasak, Mr. Hasak took out his "peeper," showed it to him, and told him to touch it, which John did.  (SART Interview Tr., Ex. V to Pls.' 56(a)2 at 13–14.)  John described feeling "bad," and said that while he wanted to go back to school to see Ms. Schultz, he did not want to see Mr. Hasak again.  (*Id.* at 15, 22–23.)  Detective Chester Perkowski, who was present for the

---

[1] Ms. Schultz and Dr. Falcone claim there were technical difficulties.  (Falcone Dep. Vol. I at 73; Schultz Dep., Ex. C to Pl.'s 56(a)2 at 83.)

interview, recalled that John's demeanor changed from "very upbeat" to "very somber" and "disturbed" when he began to discuss the incident. (Police Report at 6.)   Based on the interview, Ms. Smith-Harker concluded that John's account was credible. (DCF Dec. 2009 Report at 6.)

In November 2009, Mr. Hasak submitted to a private polygraph exam, the results of which showed "no indication of deception." (Police Report at 7.)  Mr. Hasak took a second polygraph exam, this time administered by the Connecticut State Police, in December 2009, which yielded similar results. (*Id.* at 8.)  Nonetheless, DCF concluded in December 2009 that John's allegations had been substantiated, and it placed Mr. Hasak on the Child Abuse and Neglect Central Registry. (DCF Report at 39.)  Mr. Hasak appealed DCF's decision, and it was overturned in February 2010 for reasons undisclosed to the Court. (*Id.* at 3.)

Although the police requested an arrest warrant for Mr. Hasak (Police Report at 9), the State Attorney's Office determined that it did not have enough evidence to seek a warrant (DCF Appeal Report, Ex. H to Defs.' 56(a)1 at 3).  Dr. Falcone concluded his investigation and issued his final report in April or May 2010, finding that John's allegations could not be substantiated and that Mr. Hasak should be removed from administrative leave and re-assigned to another school. (Falcone Report, Ex. GG to Defs.' 56(a)1 at 8.)

Several people close to John testified that although his behavior had been improving in the period prior to October 15, 2009, after that date, he began to act out aggressively and to display other "classic" behaviors of someone ("especially a child with a disability such a Downs [sic] Syndrome") "who has been traumatically affected by a

4

sexual assault." (Police Report at 8; *see also* Bellino Dep., Ex. G to Pls.' 56(a)2 at 8; Gallo

Dep., Ex. J to Pls.' 56(a)2 at 79).

## II.    Discussion[2]

Plaintiffs raise a number of claims against defendants other than Mr. Hasak which

turn on evidence of whether the alleged abuse occurred and whether or not those other

defendants had notice of the alleged abuse before October 15, 2009.  However, if John

does not testify at the trial,[3] much of Plaintiffs' evidence will be hearsay—the admissibility

of which is contested by Defendants.[4]  Because "[a] party 'cannot rely on inadmissible

hearsay in opposing a motion for summary judgment . . . absent a showing that

admissible evidence will be available at trial,'" the Court must, as a preliminary matter,

determine the likely admissibility of the hearsay evidence offered by Plaintiffs. *Nyack v. S.*

---

[2] Summary judgment is appropriate where, "resolv[ing] all ambiguities and draw[ing] all permissible factual inferences in favor of the party against whom summary judgment is sought," *Holcomb v. Iona Coll.*, 521 F.3d 130, 137 (2d Cir. 2008), "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law," Fed. R. Civ. P. 56(a).  "A dispute regarding a material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Williams v. Utica Coll. of Syracuse Univ.*, 453 F.3d 112, 116 (2d Cir. 2006) (quotation marks omitted).  "The substantive law governing the case will identify those facts that are material, and '[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.'" *Bouboulis v. Transp. Workers Union of Am.*, 442 F.3d 55, 59 (2d Cir. 2006) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  When considering a motion for summary judgment, the Court may consider depositions, documents, affidavits, interrogatory answers, and other exhibits in the record.  Fed. R. Civ. P. 56(c).

[3] Plaintiffs have not indicated whether or not John will testify.  The Court will assume, however, for purposes of this analysis, that he will not.

[4] The hearsay issue was raised for the first time on Reply, so the Court requested, and the parties have submitted, additional briefing on this subject.

*Conn. State Univ.*, 424 F. Supp. 2d 370, 374 (D. Conn. 2006) (quoting *Burlington Coat Factory Warehouse Corp. v. Esprit De Corp.*, 769 F.2d 919, 924 (2d Cir. 1985)).

### A. Likely Admissibility of Hearsay Evidence

Plaintiffs offer hearsay evidence in support of two claims, upon which most of the counts in the complaint rest: (1) Mr. Hasak sexually abused John and (2) Melissa Bellino (John's teacher), Laura Conte (Assistant Director of Special Education for elementary schools in Darien), Andrea Cunha (the school psychologist), and/or Ms. Fisher had notice of that abuse before October 15, 2009. The evidence consists principally of: testimony[5] by Mr. Doe, Mrs. Doe, and Dr. Cornelia Gallo (John's psychiatrist), and the SART interview transcript.

With respect to Mr. and Mrs. Doe's testimony about what John told them, Plaintiffs argue alternatively that their statements are not hearsay because they are prior consistent statements, *see* Fed. R. Evid. 801(d)(1)(B), or that they are hearsay but they are nonetheless admissible under the excited utterances exception, *see* Fed. R. Evid. 803(2). (*See* Pls.' Hearsay Br. [Doc. # 365] at 3–7.) Plaintiffs admit that John's statements during the SART interview are hearsay but contend that they are admissible either as excited utterances, *see* Fed. R. Evid. 803(2), or under the residual hearsay exception, *see* Fed. R. Evid. 807. (*See* Pls.' Hearsay Br. at 7, 10–15.) Finally, Plaintiffs argue that Dr. Gallo's testimony about what John told her during therapy sessions is not hearsay because it constitutes prior consistent statements, *see* Fed. R. Evid. 801(d)(1)(B), or in the

---

[5] The Court assumes, for purposes of deciding this motion, that the evidence now offered in the form of depositions and affidavits will be offered in the form of testimony at trial.

alternative, that Dr. Gallo's testimony is admissible under the statements made for medical diagnosis or treatment exception, *see* Fed. R. Evid. 803(4). (*See* Pls.' Hearsay Br. at 13.)

### 1. Mr. and Mrs. Doe

In his deposition and statements to DCF, Mr. Doe related that on the morning of October 15, 2009, a half hour to an hour after John woke up, he was having breakfast with John when John stated "without provocation" (DCF Dec. 2009 Report at 5), that Mr. Hasak had taken out his "peeper" and "made him touch it" (Mr. Doe Dep. at 67). Mr. Doe then called his wife downstairs, and when she entered the room, John "kind of immediately went into the same conversation with her, pretty much repeated exactly what she had just told [Mr. Doe]." (*Id.*) Mr. Doe reported that John's affect while he talked to his parents that morning was "[v]ery serious and matter of fact." (*Id.*)

Mrs. Doe detailed a similar account in her statement to the police. (*See* DCF Report at 25.) According to her, at approximately 7:55 a.m. on the morning of October 15, 2009, she went downstairs and found her husband and son already down there. (*Id.*) John stated, without prodding, "Mom, Mr. Hasak . . . pulled down his pants and showed me his peeper." (*Id.*) Mrs. Doe recalled that John told her the incident had happened that week, and that while Mr. Hasak did not touch him, Mr. Hasak told John to touch Mr. Hasak's "peeper." (*Id.*) She added that John "said Mr. Hasak told him not to tell anyone or the police would come and take Mr. Hasak." (*Id.*)

### a. Prior Consistent Statement

Plaintiffs' first argument, that Mr. and Mrs. Doe's statements about what John told them are not hearsay because they are prior consistent statements, reflects a

misunderstanding of Rule 801(d)(1)(B).  Under Rule 801(d)(1)(B), a declarant-witness's prior statement is not hearsay if the "declarant testifies and is subject to cross-examination about a prior statement, and the statement . . . is consistent with the declarant's testimony."  Here, however, the declarant is John, but the witnesses are his parents.  John will not testify or be subject to cross-examination about his statements to his parents, and therefore Rule 801(d)(1)(B) has no applicability here.

### b.  Excited Utterances

Plaintiffs next argue that John's statements to Mr. and Mrs. Doe, offered through them, are admissible as excited utterances.  Under Rule 803(2), "[a] statement relating to a startling event or condition, made while the declarant was under the stress of excitement that it caused" is admissible "regardless of whether the declarant is available as a witness."  Factors that a "trial court must weigh in determining whether . . . offered testimony is within the 803(2) exception" include: "[t]he lapse of time between the startling event and the out-of-court statement," "the age of the declarant, the physical and mental condition of the declarant, the characteristics of the event and the subject matter of the statements."  *United States v. Iron Shell*, 633 F.2d 77, 85–86 (8th Cir. 1980).  "In order to find that 803(2) applies, it must appear that the declarant's condition at the time was such that the statement was spontaneous, excited or impulsive rather than the product of reflection and deliberation."  (*Id*. at 86)

However, as the Fourth Circuit noted, "much criticism has been directed at courts which place undue emphasis on the spontaneity requirement in child sexual abuse cases.  It has been argued that children do not necessarily understand sexual contact by adults to be shocking. . . .  Even if the child is aware of the nature of the abuse, significant delays in

reporting this abuse may occur because of confusion, guilt, and fear on the part of the child." *Morgan v. Foretich*, 846 F.2d 941, 947 (4th Cir. 1988). As a result, "[s]everal courts of appeals have lowered the evidentiary bar to the admission of [excited utterances] when the victim declarant is a young child, recognizing the possibility of fabrication and coaching are limited and the likelihood that the trauma from the startling event will remain with the child for some time after the encounter is strong." *United States v. Hefferon*, 314 F.3d 211, 222–23 (5th Cir. 2002).

For example, in *United States v. Farley*, the Tenth Circuit held that a five-year old child's statements to her mother eight hours after she was sexually assaulted "would have been admissible as excited utterances." 992 F.2d 1122, 1126 (10th Cir. 1993). The court noted that although there was "some lapse of time. . . the statements were made relatively quickly after the child had an opportunity to speak with her mother alone." *Id.* Moreover, the court found, "considering the surprise of the assault, its shocking nature and the age of the declarant, the stress of the attack could have continued throughout that day and until the following morning." *Id.* (internal quotation marks omitted).

In this case, it is not altogether clear when Mr. Hasak is alleged to have abused John, making it difficult to determine with any precision how much time elapsed between the alleged abuse and John's statements to his parents. There is however some indication that the abuse may have taken place on October 14, the day before John spoke with his parents. On October 14, Mrs. Doe received a phone call from Ms. Bellino saying that John was acting "strangely." (Mrs. Doe Dep. at 365.) According to Ms. Bellino, John was demanding that she call his mother, something he had not done before. (Bellino Dep. at 80.) Mrs. Doe stated that when John came home from school that night he behaved in a

9

"[v]ery unusual" manner.  (Mrs. Doe Dep. at 365.)  "He was very withdrawn."  (*Id.*)  When he got off the bus, he "wouldn't talk to" or look at Mrs. Doe.  (*Id.*)  He "didn't want to watch TV, which was unusual. . . .  He was completely different.  And then it took [Mrs. Doe] about an hour to jog him out of it and then he seemed better."  (*Id.* at 365–66.)  The next morning, he told each of his parents that Mr. Hasak had abused him, without prompting from either of them.  (Mr. Doe Stmt. to Police, Ex. NN to 56(a)2 at 1.)  When Mr. Doe asked him when the abuse had occurred, John "could not say exactly but intimated [that it had happened] recently, this week."  (*Id.*)

Others also believe whatever happened to John occurred on October 14.  Dr. Luddy told the police that she "believe[d] that something very upsetting to [John] occurred on 10/14/09" because "[s]ince October 15, 2009, [his] behavior has regressed back to the way he behaved after years of restraint and seclusion at a different school."  (Luddy Stmt. to Police, Ex. KK to Pls.' 56(a)2 at 5.)  Ms. Bellino expressed a similar sentiment, stating that John "became more aggressive after October 15th, and things just were happening repeatedly."  (Bellino Dep. at 8.)

John's age, his disability, the shocking nature of the alleged abuse, the spontaneity of his statements to his parents, and the timing of his statements all lend support for the conclusion that John's description of the abuse to his parents will likely be admissible as excited utterances.  However, as explained below, even if inadmissible as excited utterances, they will likely be admissible under the residual exception.

### c.  Residual Exception

Rule 807 provides that a hearsay statement may be admitted if: "(1) the statement has equivalent circumstantial guarantees of trustworthiness" as statements admissible

under one of the enumerated hearsay exceptions in Rules 803 and 804; "(2) it is offered as evidence of a material fact; (3) it is more probative on the point for which it is offered than any other evidence that the proponent can obtain through reasonable efforts; and (4) admitting it will best serve the purposes of these rules and the interests of justice."

With regard to the first element, the United States Supreme Court has "identified a number of factors" courts should consider in determining "whether hearsay statements made by a child witness in child sexual abuse cases are reliable," including "spontaneity and consistent repetition," "mental state of the declarant," "use of terminology unexpected of a child of similar age," and "lack of motive to fabricate." *Idaho v. Wright*, 497 U.S. 805, 821–22 (1990).

Defendants vehemently argue that there are insufficient guarantees of trustworthiness with regard to John's allegations.  (Defs.' Hearsay Br. [Doc. # 364] at 5.) Defendants quote Dr. Luddy as stating that John's "language processing through speech and language evaluations as well as through observations is very difficult for him" and his "ability to process or to use language was not always on topic" (Luddy Dep. at 88), as support for their assertion that John's "severe cognitive and communicatively disability limit" his ability to understand and communicate his experiences such that his account of the abuse cannot be relied upon.  (Defs.' Hearsay Br. at 5, 11.)  However, Dr. Luddy also said that John "did have some surprising abilities to articulate thoughts or articulate language, but not necessarily on topic or on target with what the question might be or what the educator might be wanting to elicit from him." (Luddy Dep. at 88–89.)

Moreover, notwithstanding Defendants' contention that John's account is unreliable because he sometimes repeats things he has heard on television and because he

11

has used inappropriate language in the past (*see* Defs.' Hearsay Br. at 7), Mr. Hasak himself testified that it was always clear to him when John was playing and when he was being serious (*see* Hasak Dep. at 99).  Importantly, many of the people who heard John's account of the alleged abuse on October 15 and October 21 commented on his unusually serious mood and noted that he had clearly experienced a traumatic event.  Ms. Atkinson, for example, told police that John's demeanor during her interview with him on October 15 "fluctuated from his normal intonation when talking about muffins, social studies, etc. to a quieter, more serious tone" she had "not seen in the time [she] ha[d] worked with [him] (six times weekly over . . . thirteen months)."  (Atkinson Stmt. to Police at 2.)  Ms. Atkinson added: "I have experienced [John] in pretend play and pretend conversations.  I have also experienced [John] using inappropriate language, referencing topics involving private parts.  The manner in which he related the sexual allegations against Mr. Hasek [sic] was nothing like the manner in which he has used that type of language.  Having worked closely with [John] and seeing the range of language and the manner in which he delivers it, it was startling and upsetting to observe his version of this event."  (*Id.* at 2–3.)

Similarly, Detective Perkowski, who was present for the SART interview, stated that at the beginning of the interview, when John was "participating in his everyday school activities with Ms. Schultz," his "demeanor [wa]s very upbeat" but that "[w]hen the interview turned to the incident with Mr. Hasak," he "became very somber and seemed to be disturbed."  (Police Report at 6.)  Dr. Luddy, also present for the SART interview, recalled that John's "behavior changed dramatically when he was asked about the incident" (Luddy Stmt. to Police at 5) and he became "sad and withdrawn" (Falcone Report, Ex. GG to 56(a)1 at 4 (citing Dr. Luddy)).

Although there were minor inconsistencies in John's story (especially regarding whether Mr. Hasak had shown him his penis on one or more occasions), his various accounts of the incident(s) were generally quite consistent, as several witnesses noted. (*See* Police Report at 4 ("[I]n this interview, the victim was consistent with this story as previously told to his parents earlier in the day."); Luddy Stmt. to Police at 5 (During the SART interview, John "was easy to understand and consistent with the information that he shared with his father, Ms. Schultz and Ms. Atkinson and again the interview."); Falcone Report at 4 (At the SART interview, John "was 'consistent and credible.'" (quoting Dr. Luddy)); Orelove Dep. at 46–47 ("I found that he seemed to me in watching the SART interview to be very credible and was fairly consistent in his reporting initially to his father and then subsequently mentioned this in a couple other interviews that were done."); Gallo Dep. at 66 ("[John's] initial disclosure of this event was 'Mr. H. touched my peeper.' . . . And that was a, like, a very pervasive clear sentence.  He said it many, many, many, many, many times.").)  *See also Doe v. United States*, 976 F.2d 1071, 1079 (7th Cir. 1992) ("[I]t is to overall consistency that we look, not constancy with regard to each and every detail.  'What is most important is consistency regarding the core details of the experience.  Consistency about peripheral details is less important.'" (quoting John E.B. Myers, *Child Witness Law and Practice*, § 5.37A, at 210 (Supp. 1991)).

The Court also finds it significant that John's allegations to each of his parents and then to Ms. Schultz were made spontaneously, without much prompting or questioning. *See Doe*, 976 F.2d at ("[T]he more spontaneous the statement, the less likely it is to be a product of fabrication, memory loss, or distortion."); *see also Wright*, 497 U.S. at 821 (noting that one factor related to whether hearsay statements are reliable is spontaneity

and consistent repetition).  Ms. Atkinson recalled that in the October 15 interview, Ms. Schultz told John that "they were going to write a story and suggested they write a story about things that you're told not to talk about.  [John] immediately said, 'Like this morning.'  When asked, 'What do you mean?', John responded by saying 'What I told Dad.'"  (Atkinson Stmt. to Police at 1.)  Ms. Atkinson commented that she "was frankly surprised that he directed the conversation to that subject immediately, without prompting.  He proceeded to report that Mr. Hasek [sic] took his pants off and told [John] to touch his 'peeper.'"  (*Id.*)  Mr. Doe likewise related that John had launched into the story "without provocation" (DCF Dec. 2009 Report at 5) and that when he called his wife downstairs, John, "without any prompting" "started to tell her the same thing" (Mr. Doe Stmt. to Police, at 1).

Other evidence of John's reliability include statements by Dr. Gallo and Ms. Bellino about John's ability to lie.  Dr. Gallo stated that John "doesn't lie or intentionally make things up" (Gallo Dep. at 24) and Ms. Bellino opined that he "does not have the mental capacity to make up such a story" (Bellino Dep. at 103).  Ms. Bellino, Ms. Schultz, and John Woodring, a teacher at Tokeneke, confirmed that John had never accused anyone of sexually abusing him before.  (*See* Bellino Dep. at 97 ("Had he ever accused anybody of abuse before? No."); Schultz Dep. at 90 ("[H]ad [John] ever made any kind of assertion like this before, that anybody had taken their pants off or exposed their penis to him while in school? Not to me."); Woodring Dep., Ex. A to 56(a)1 at 65 ("During the time you worked with [John] did he ever tell you, did he ever accuse anybody of sexually assaulting him? No. Would it be out of character for [John] to accuse somebody of sexually assaulting him? . . . Yeah, I guess it would be out of character.").)

14

Several witnesses testified that John's behavior regressed after October 15 in ways that were consistent with a child suffering from trauma.  Mrs. Doe stated that before October 15, John was "a happy, bubbly child" but since then, "his whole demeanor has changed;" he has become "very withdrawn," "frightened," and "hypervigilant." (Mrs. Doe Dep. at 16, 54, 422.)  Dr. Gallo related that John sometimes has flashbacks in which his posture becomes "rigid," "[h]e's grinding his teeth," "[h]e's rocking and he appears extremely distant" and he is "clearly a person in distress."  (Gallo Dep. at 7.)  Dr. Fred Orelove, an expert hired by Plaintiffs, noted that after October 15, "there was a sudden upswing of [challenging] behaviors," some of which "appear[ed] to [him] to be highly indicative of potential abuse."  (Orelove Dep. at 47–48.)  Dr. Luddy reported that John's behavior since October 15 leads her to "believe that something very upsetting" to John happened to him.  (Luddy Stmt. to Police at 5.)

Moreover, many of John's fears appear to center on Mr. Hasak specifically.  Dr. Gallo testified that John "did not want to see Mr. Hasak or he would look for him to make sure that he wasn't there.  And when he was at Tokeneke, he often would be worried that [Mr. Hasak] would be coming to Tokeneke or [Mr. Hasak] would be coming to Middlesex or he would be hired by Dr. Golonka. . . . [John] would say, 'No Mr. Hasak.'" (Gallo Dep. at 85.)  Mr. Doe stated, similarly, that John was worried about seeing Mr. Hasak and has "said many times, like in the SART interview, he didn't want to see Mr. Hasak again.  And he's never told us that he missed him or wanted to see him."  (Mr. Doe Dep. at 171.)  Mrs. Doe said that John talks about Mr. Hasak "on an almost daily basis" and does not speak anywhere near as frequently about anyone else.  (Mrs. Doe Dep. at

422, 427.)  During the SART interview, when asked if he liked school with Ms. Schultz, John replied "yea but not with Mr. Hasik [sic]."  (SART Interview Tr. at 23.)

Together, this evidence provides sufficient guarantees of trustworthiness to satisfy Rule 807's first prong,[6] and its other prongs are easily satisfied here.  John's statements to his parents "[are] unquestionably material," *United States v. Nick*, 604 F.2d 1199, 1204 (9th Cir. 1979), and "would be the most probative on what happened" to John, *Brookover v. Mary Hitchcock Mem'l Hosp.*, 893 F.2d 411, 420 (1st Cir. 1990).  Moreover, at trial, the Court will "ha[ve] the benefit of seeing [Mr. and Mrs. Doe] testify . . . and the jury [will be] able to evaluate the credibility of [their] testimony and determine the weight it should be given."  *Id.*  Finally, "the interests of justice [will be] served by the admission into evidence of testimony concerning [John's] statements.  The propriety of requiring extremely young [or disabled] victims of abuse to take the stand as the only method for putting before the jury what is, in all probability, the only first-hand account of the circumstances of abuse other than that of the defendant is debatable.  In a more relaxed environment, the child in this case was able to provide his version of the relevant events and yet avoid a potentially traumatic courtroom encounter."  *United States v. Cree*, 778 F.2d 474, 478 (8th Cir. 1985).  Because Mr. and Mrs. Doe's testimony about John's description of the abuse likely satisfies each of the prongs of Rule 807, it will likely be admissible at trial under the residual exception.

---

[6] Notwithstanding Defendants' insistence (*see* Defs.' Hearsay Br. at 9), the Court does not find dispositive the fact that the Does sent John to school on October 15. Immediately after sending John to school, they called Dr. Luddy.  There is no evidence that they did not believe that something had happened to John.

The Court will therefore consider John's statements to his parents about the alleged abuse in its analysis of the motion for summary judgment.

### 2.   SART Interview Transcript

In addition to John's statements to his parents, Plaintiffs offer the SART interview transcript as evidence that the alleged abuse occurred.  During the interview, Ms. Schultz prompted John by saying "you were telling me something last week and I wonder if you could tell me more about it."  (SART Interview Tr. at 13.)  John responded "about Mr. Hasik [sic]" and then added, "he just took it out," "he just showed my [sic] his peeper, it's disgusting his penis."  (*Id.*)  After some dialogue, Ms. Smith-Harker asked, "When you touched his penis, did it change[?] [W]as it different?" to which John replied "it was different."  (*Id.* at 15.)  Ms. Smith-Harker asked "Was there hair or no hair or[. . .]" and John replied "a little hair."  (*Id.*)  Later, she took out a doll and began to identify body parts.   John responded, "I want to see something. . . hold that down ok, hold the underwear down – that's his penis."  (*Id.* at 19.)

Plaintiffs contend that John's statements during the SART interview are likely admissible as either excited utterances or under the residual exception.

### a.   Excited Utterance

In arguing that John's statements at the SART interview are admissible as excited utterances, Plaintiffs cite decisions from the Eighth and Fourth Circuits holding that "[t]he length of time in between the 'startling event' and the hearsay statement sought to be admitted is relevant but not 'dispositive' when applying the rule of 803(2)."  (Pls.' Hearsay Br. at 5 (citing *Iron Shell*, 633 F.2d at 85; *Morgan*, 846 F.2d at 947).)  However, Plaintiffs do not offer any case in which a statement made a full week after the startling

event was admitted as an excited utterance.  Indeed, while it is certainly true that victims of sexual abuse remain "under the stress of excitement," Fed. R. Evid. 803(2), caused by the abuse a week after the event, construing the excited utterances exception so broadly would permit the exception to swallow the rule.  Victims of abuse likely remain under stress for months or years after the event, but admitting statements made so long afterwards would undermine the purpose of 803(2), which is to permit statements made without the opportunity for "reflection and deliberation."  *Iron Shell*, 633 F.2d at 86. Because John's statements at the SART interview, a week after the alleged abuse occurred may have been the product of reflection and deliberation, they are likely not admissible as excited utterances.

### b.  Residual Exception

Nonetheless, the statements are likely admissible under the residual exception. For all the reasons discussed above regarding the admissibility of John's statements to his parents, John's statements to the SART interviewers describing the alleged abuse have sufficient guarantees of trustworthiness, were offered as evidence of a material fact, are more probative than any other evidence, and admitting them will serve the interests of justice.  Therefore, the Court will consider the SART interview in its determination on the motion for summary judgment.[7]

_____

[7] Defendants' opposition includes an affidavit of an expert submitted to the Court for the first time as an exhibit to Defendants' hearsay brief.  (*See* Ex. 6 to Defs.' Hearsay Br.)  The Court stated in its Order denying Plaintiffs' request for additional time to file a corrected Local 56(a)2 Statement that the Court's request for briefing on the hearsay issue "was not an invitation to expand the record or to add additional evidence."  (Order on Plaintiff's Motion for Extension of Time [Doc. # 358] at 2.)  The "time for submitting

### 3. Dr. Gallo

Dr. Gallo testified that John often talks about Mr. Hasak's alleged abuse during their sessions and that he has post-traumatic stress disorder as a result of his experiences. (Gallo Dep. at 79.)  She described John "reliv[ing] elements of his trauma," "avoid[ing] things that reminded him of what had happened," having nightmares, having "fits of anger," "becom[ing] aggressive," and feeling "very isolated, kind of numb."  (*Id.* at 79.) She added that John "did not want to see Mr. Hasak" and would talk about his fears of seeing him again.  (*Id.* at 85.)

Plaintiffs assert that this and other of Dr. Gallo's testimony recalling statements John made to her about the abuse is admissible under either the prior consistent statement exception or under the statements made for medical diagnosis or treatment exception.  However, for the same reasons that Mr. and Mrs. Doe's testimony is not admissible as prior consistent statements, Dr. Gallo's testimony also will not be admitted under that exception.  Nonetheless, it is likely admissible under the statements made for medical diagnosis or treatment exception.  Rule 803(4) provides that a statement that "is made for—and is reasonably pertinent to—medical diagnosis or treatment; and describes medical history; past or present symptoms or sensations; their inception; or their general cause" is admissible "regardless of whether the declarant is available as a witness."

Defendants contend that Dr. Gallo's testimony is not admissible under Rule 803(4) because "the evidentiary record fails to show that [John] sought psychiatric care with Dr. Gallo—rather, [John's] parents brought him to Dr. Gallo.  It similarly fails to

---

additional evidence has long since passed."  (*Id.*) Accordingly, Plaintiffs' Motion to Strike Exhibit 6 [Doc. # 366] is granted.

show that [John] was aware that the purpose of seeing Dr. Gallo was to receive psychiatric treatment." (Defs.' Hearsay Br. at 17.) The Court does not find these arguments persuasive. There is no question that Dr. Gallo is a medical provider and that John was seeing her for therapy and psychiatric treatment. She prescribed him medication and talked with him about his emotions and memories. Defendants provide no evidentiary basis for concluding that John did not understand that Dr. Gallo's role was to help him to feel better and that telling her the truth would enable her to do that.[8] Therefore, in analyzing the summary judgment motion, the Court will consider Dr. Gallo's testimony regarding John's statements to her describing the alleged abuse.

### 4. Evidence of Notice

In addition to offering hearsay evidence to prove that the abuse occurred, Plaintiffs offer hearsay evidence to prove that certain individuals had notice of the abuse. Neither party distinguishes between the two purposes for which this evidence is offered, but the Court finds the distinction important.

Plaintiffs contend that four Defendants or employees of Defendants had notice of John's allegations against Mr. Hasak before October 15, 2009: Ms. Bellino, Ms. Conte, Ms. Fisher, and Ms. Cunha.

---

[8] Though Defendants do not appear to challenge specifically the admission under 803(4) of statements identifying Mr. Hasak, the Court finds that these statements are likely admissible because as other courts have observed, "[s]exual abuse involves more than physical injury; the physician must be attentive to treating the victim's emotional and psychological injuries, the exact nature and extent of which often depend on the identity of the abuser." *United States v. JDT*, 762 F.3d 984, 1003 (9th Cir. 2014) (internal quotation marks omitted); *United States v. Renville*, 779 F.2d 430, 437 (8th Cir. 1985) (same).

### a.   Ms. Cunha and Ms. Fisher

During the SART interview on October 21, 2009, John was asked, "Did you ever tell anybody else about [Mr. Hasak] asking making [sic] you see his penis?" to which John replied "yea" and then listed "Mrs. Fisher" and "Mrs. Kiuna [Cunha]." (SART Interview Tr. at 16.) Ms. Smith-Harker then questioned whether John told them "that day or a different day" and John replied "a different day." (*Id.*)

However, at the school interview on October 15, when Ms. Schultz asked John if he had told anyone about the allegations, he stated, "We are going to tell Mrs. Fisher. Cause she'll know." (Notes of 10/15 Mtg. at 2.) When Ms. Schultz queried why they were going to tell Mrs. Fisher, John responded, "Because she is smart and she knows everything." (*Id.*) Mr. Doe testified that John told him and Mrs. Doe "that he had made references to [Ms. Cunha] of things that were happening to him with Mr. Hasak" (Mr. Doe Dep. at 181), including "some information that Mr. Hasak was trying to kiss him or doing something like that" (*id.* at 232) but that he did not "have a time frame" for when John made these statements to Ms. Cunha (*id.* at 233). Ms. Cunha testified however that she does not "recall [John] complaining about Mr. Hasak" either before or after October 14, 2009. (Cunha Dep. at 86.) There is nothing in the record about whether Ms. Fisher recalls John telling her about Mr. Hasak before October 15, 2009.

Regardless of whether this evidence is admissible or not, it is insufficient to create a genuine issue of material fact regarding whether Ms. Cunha and Ms. Fisher had notice of the alleged abuse before October 15, 2009. None of the statements attributed to John are specific enough about either the substance or the timing of his statements to Ms.

Cunha and Ms. Fisher for reasonable jurors to conclude that Plaintiffs proved Ms. Cunha and Ms. Fisher had notice of the abuse before October 15, 2009.

### b. Ms. Conte

Dr. Gallo testified that John told her during one of their sessions that on one occasion, Ms. Conte walked in on him struggling with Mr. Hasak over John's pants. (Gallo Dep. at 126, 128.)  According to Dr. Gallo, "the way [John] described being on the floor and protesting and being upset and carrying on suggested that there was a problem going on[] [when] Ms. Conte came in . . . [and that] there was distress on [John's] part." (*Id.* at 128.)  Ms. Conte does not offer in the record any alternative, benign explanation of the circumstances John described, instead denying outright ever having walked into Room 213 when Mr. Hasak was taking off John's pants or changing his pants or when John did not have his pants on.[9]  (Conte Dep. at 96–97.)

---

[9] Dr. Gallo acknowledged that the scene John described might be interpreted as nothing more than Mr. Hasak assisting John in changing his pants after he had wet them (Gallo Dep. at 128), but that determination is properly left to the jury.

Notwithstanding Defendants' argument to the contrary (*see* Defs.' Hearsay Br. at 11), the fact that John was unable to give a time frame for the alleged incident is not dispositive.  Mr. Hasak was removed from the school on October 15, so there is no question that if the incident John described occurred, it occurred before October 15.  Nor is the Court persuaded that John's testimony must be deemed not credible because he did not mention the incident with Ms. Conte until three and a half years after the event.  (*See id.*)  As the Eighth Circuit acknowledged in *United States v. Dorian*, 803 F.2d 1439, 1444 (8th Cir. 1986), "it frequently takes a long time for children to share what is really going on and they may then do so in stages, telling a little more each time." *See Doe*, 976 F.2d at 1079 (same).  Viewing the evidence in the light most favorable to Plaintiffs, the Court concludes that there is a genuine issue of material fact regarding whether Ms. Conte had notice of abnormal and unacceptable conduct by Mr. Hasak before October 15 and failed to take any corrective measures.

Because a reasonable jury, crediting John's account, could conclude that Ms. Conte did witness suspicious conduct by Mr. Hasak in his interactions with John, notwithstanding her denial, and thus had notice of Mr. Hasak's alleged abusive conduct before October 15, 2009, the Court must determine the likely admissibility of this evidence of notice.

The Court concludes that the evidence of notice to Ms. Conte, though hearsay, will likely be admissible under the exceptions for statements made for medical diagnosis or treatment. Although John's statements to Dr. Gallo do not pertain directly to the abuse, as noted above, "child abuse involves more than physical injury; the physician must be attentive to treating the emotional and psychological injuries which accompany this crime." *Rensville*, 779 F.2d at 437. Part of John's psychological injury here appears to be the trauma and anxiety that resulted from Ms. Conte observing John struggling with Mr. Hasak and not stopping him. (*See* Gallo Dep. at 128.) Because John's statements to Dr. Gallo were made for the purpose of obtaining medical treatment, Dr. Gallo's testimony about those statements will likely be admissible.

### c. Ms. Bellino

Dr. Gallo's progress notes from her July 3, 2013 session with John reveal that John discussed a "memory with an incident with the Lion King. He said Mrs. Bellino made him watch the Lion King. He said, 'I said Mr. H touch my peeper.' And Ms. Bellino said, 'Sit down. You are a liar.'" (Gallo Dep. at 21.) John's daily data sheet from October 14, 2009 corroborates that he did in fact watch the Lion King that day. (Data Sheet Dated 10/14/09, Ex. JJ to 56(a)2.) Defendants contest the veracity of John's statements, pointing to the initial school interview, when Ms. Schultz asked John if he had told Ms. Bellino

about the alleged abuse, he replied "No" (Notes of 10/15 Mtg. at 2) and to Ms. Bellino's testimony that John had never told her that Mr. Hasak did anything wrong (Bellino Dep. at 107).

However, viewing the evidence of alleged notice in the light most favorable to Plaintiffs, which is more specific both as to the content and the timing than the evidence of notice to Ms. Fisher and Ms. Cunha, and has some corroboration in the daily data sheets, the Court concludes that, if admissible, a reasonable jury could base a finding that Ms. Bellino had notice of the alleged abuse as of October 14, 2009 on it.[10]

The Court next considers whether the evidence of notice to Ms. Bellino, while hearsay, may be admissible with appropriately crafted limiting instructions for the jury. It concludes that it may be.  The evidence of notice, described above, is double-hearsay. That is, there are two layers of hearsay evidence: the underlying hearsay evidence is John's alleged October 14 statement to Ms. Bellino telling her about the abuse and his description of Ms. her response; the second layer of hearsay evidence is John's statement to Dr. Gallo about what he told Ms. Bellino.  Because "[e]ach hearsay statement within multiple hearsay statements must have a hearsay exception in order to be admissible," *United States v. Cruz*, 894 F.2d 41, 44 (2d Cir. 1990) (citing Fed. R. Evid. 805), each layer of the double-hearsay must be analyzed separately.

Beginning with the underlying hearsay, the Court concludes that John's alleged statement to Ms. Bellino is likely admissible under the residual exception.  The first prong

---

[10] Defendants acknowledged at oral argument that if Ms. Bellino had notice of the abuse on October 14, John would have been harmed by her failure to report his allegations, even though Mr. Hasak was removed on October 15 because John saw Mr. Hasak the morning of October 15 which may have been a traumatic encounter.

required for the residual exception is satisfied because there are significant indicia of reliability.  John told each of his parents substantially the same story he told Dr. Gallo,[11] and the content of the story remained consistent over time, even three years after the event.  John's daily data sheet for October 14 corroborates that he did in fact watch the Lion King that day.  (Data Sheet Dated 10/14/09, Ex. JJ to 56(a)2.)  Further, Ms. Bellino's testimony confirms that John was extremely upset on October 14, was acting strangely, and wanted to call his mother.  (Bellino Dep. at 80.)  Together, this is at least minimally adequate circumstantial evidence of trustworthiness to permit John's statements to Ms. Bellino to be admitted.  The second, third, and fourth prongs of the residual exception are also satisfied because Dr. Gallo's testimony regarding John's statements to her is offered as evidence of a material fact, is more probative on the point for which it is offered than any other evidence Plaintiffs could provide, and admitting it will serve the interests of justice.

Turning then to the second layer of hearsay, the Court determines that this evidence too is likely admissible.  As explained above, John's statements to Dr. Gallo

---

[11] Mr. Doe testified that John "told Bellino" about the abuse "on the 14th, at which point he wanted her to call [Mrs. Doe]." (Mr. Doe Dep. at 181.)  Later in his testimony, he admitted that he did not "know the exact words" John used but that he believed that John had "indicated that [Mr. Hasak] had done something sexual to him" and that Ms. Bellino told him "that he was wrong," that he "shouldn't say that and that he should, you know, be quiet and watch the Lion King." (Mr. Doe Dep. at 224.)

Mrs. Doe testified that when she asked John if he had told anybody about the abuse he said "Ms. Bellino." (Mrs. Doe Dep. at 151.)  Specifically, she said John has told her on three or four occasions that he told Ms. Bellino that Mr. Hasak had showed him "his peeper" and made him touch it and that Ms. Bellino's response had been: "Don't tell anybody that.  He could get in trouble." (*Id.* at 151–52.)

about what he told Ms. Bellino are likely admissible under the exception for statements made for medical diagnosis or treatment.  Having determined that both John's statements to Ms. Bellino and his statements to Dr. Gallo about what he said to Ms. Bellino will likely be admissible, the Court concludes that Plaintiffs have adduced sufficient evidence of notice to Ms. Bellino, and the Court now turns to the substance of the motion for summary judgment.

### B.  Count I (ADA and Rehabilitation Act) (BOE only)

Plaintiffs claim that Defendant BOE discriminated against John on the basis of his disability by "fail[ing] to credit John's report that he was being abused" and "fail[ing] to take appropriate action to further report and/or stop the abuse," thereby interfering with John's "right to receive educational services in a safe environment free of sexual harassment."  (Pls.' Opp'n Mot. to Dismiss [Doc. # 336] at 27.)  Under Title II of the ADA and Section 504 of the Rehabilitation Act, no qualified "individual with a disability" shall, by reason of such disability, "be denied the benefits of" the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity.  42 U.S.C § 12132; 29 U.S.C. § 794.  Thus, "[t]o state a prima facie claim under either the ADA or the Rehabilitation Act, . . . [a plaintiff] must allege: '(1) that he is a qualified individual with a disability; (2) that he was . . . discriminated against by a public entity; and (3) that such exclusion or discrimination was due to his disability.'" *Fulton v. Goord*, 591 F.3d 37, 43 (2d Cir. 2009) (internal alterations omitted) (quoting *Hargrave v. Vermont*, 340 F.3d 27, 34–35 (2d Cir. 2003)).

Defendants contend that Plaintiffs' claim fails as a matter of law because they have adduced no admissible evidence of the second and third elements, which both rely on

26

notice to the District.  However, as discussed above, the Court has concluded that a reasonable jury could find that Ms. Bellino and Ms. Conte had notice of the abuse.  While notice to Ms. Bellino, John's special education teacher (who is not alleged to be "an official of the school district [with] authority to institute corrective measures on the district's behalf," *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 277 (1998) (discussing notice in the Title IX context))), likely does not qualify as notice to the District, notice to Ms. Conte, the Assistant Director of Special Education for elementary schools in Darien, does.

Furthermore, to the extent the District had notice of the abuse and failed to act to stop it, a reasonable jury could find that the District's failure to act was because of John's disability.  Director of Special Education and Student Services Robin Pavia testified that based on her knowledge and experience with John, no allegation he could make about abuse would be believable because she had never "heard him . . . recite something more than once . . . without mixing up what was currently happening in school with something that happened elsewhere."  (Pavia Dep., Ex. B to Pls.' 56(a)2 at 116.)  Ms. Schultz testified that she did not believe John's allegation with regard to Mr. Hasak because although John thought it happened, John "also talks about robbers and kissing and different things."  (Schultz Dep. at 90.)  Ms. Cunha testified that she "felt that there was no way Mr. Hasak had done anything inappropriate."  (Cunha Dep., Ex. F to Pls.' 56(a)2 at 74.)  Dr. Falcone admitted that he did not interview John or his parents as part of his investigation, and that he did not view the recording of the SART interview because he felt it was sufficient to read the DCF reports.  (Falcone Dep. Vol. I at 65, 96; Falcone Dep. Vol. II, Ex. N to Pls.' 56(a)2 at 12, 17.)  Dr. Orelove, who reviewed the District's investigation into John's

allegations, stated that John's "voice was never actually included in the investigation and yet [Dr. Orelove] found that [John] seemed . . . in . . . the SART interview to be very credible and was fairly consistent in his reporting initially to his father and then subsequently mentioned this in a couple other interviews that were done." (Orelove Dep. at 46–47.)

There is, thus, a genuine factual dispute about both whether the District had notice of John's allegations before October 15, 2009 and whether the District's failure to act to stop the abuse was because of John's disability, and summary judgment is not appropriate on Plaintiffs' claims under the ADA and Rehabilitation Act.

### C.  Count II (Title IX) (BOE only)

Plaintiffs contend that Defendant BOE violated Title IX by failing to take action to stop the abuse when John reported it (prior to October 15, 2009). (Opp'n at 29.)  Title IX prohibits any entity receiving federal funding from discriminating against any person on the basis of sex.  20 U.S.C. § 1681.  "Discrimination" under Title IX has been recognized as "encompassing teacher-on-student hostile educational environment sexual harassment." *Hayut v. State Univ. of New York*, 352 F.3d 733, 750 (2d Cir. 2003) (citing *Franklin v. Gwinnett County Pub. Schs.*, 503 U.S. 60, 75 (1992) (holding that teacher's sexual harassment of student constitutes "discrimination" on the basis of sex) *and Kracunas v. Iona College*, 119 F.3d 80, 86 (2d Cir. 1997) ("When a teacher sexually harasses a student, that teacher 'discriminates on the basis of sex' in violation of Title IX.")).  "To state a hostile educational environment harassment claim under Title IX, a plaintiff must allege that []he was subjected to unwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature, and that this

behavior was sufficiently severe or pervasive to alter the conditions of h[is] educational environment and to create an abusive educational environment, analyzed from the perspective of a reasonable person." *Tesoriero v. Syosset Cent. Sch. Dist.*, 382 F. Supp. 2d 387, 395–96 (E.D.N.Y. 2005) (internal quotation marks and citations omitted).

"In cases (like this one) involving no allegations of an official policy of sex discrimination, a federally-funded educational institution can still face Title IX liability for a teacher's sexual harassment of a student.  But in such cases the plaintiff must show that 'an official of the school district who at a minimum has authority to institute corrective measures on the district's behalf has actual notice of, and is deliberately indifferent to, the teacher's misconduct.'" *Id.* (quoting *Gebser*, 524 U.S. at 277).  Thus, to succeed on a Title IX claim in this context, a plaintiff must show: (1) that he was subjected to sexual harassment or abuse; (2) the school district had actual notice of the harassment or abuse; and (3) the school district was deliberately indifferent to the harassment or abuse.

Defendants contend that the District lacked actual notice because "the evidence is uncontroverted that Bellino, Conte, and Cunha were unaware of any allegations of improper conduct."  (Mem. Supp. At 20–21.)  As already noted, however, the evidence is *not* uncontroverted; it is disputed, and because it is disputed, this claim is not appropriately decided on summary judgment.  John's allegations that he told Ms. Conte about the abuse before October 15, 2009 are sufficient to raise a genuine dispute of material fact regarding whether the District had actual notice of the abuse before October

15.[12]  *Tesoriero*, 382 F. Supp. 2d at 397 ("Whether complaints unsubstantiated by corroborating evidence and denied by the allegedly offending teacher did or should have put a school district on notice of a teacher's substantial risk to students is usually a question for the jury." (internal quotation marks and citations omitted)).  Because Ms. Conte was the Assistant Director of Special Education for elementary schools in Darien, she was undoubtedly "an official of the school district who at a minimum has authority to institute corrective measures on the district's behalf," such that any notice given to her may be imputed to the District.  Her failure to take any action whatsoever to investigate John's claims clearly satisfies the deliberate indifference standard.  *See Havut*, 352 F.2d at

---

[12] Plaintiffs' claim of actual notice appears to be based both on John's reports to Ms. Fisher, Ms. Cunha, and Ms. Bellino, and separately, on the District's knowledge that John was spending time alone with Mr. Hasak.  (*See* Opp'n at 29–30.)  To the extent Plaintiffs claim the latter, such claim is at odds with the definition of "actual notice," as it has been interpreted in this Circuit.  Although "[m]ost federal courts appear to agree that the 'actual knowledge' need only be of facts indicating that the teacher has the potential to abuse a student," *Tesoriero*, 382 F. Supp. 2d at 397, Plaintiffs point to no authority for the proposition that this standard is satisfied by showing that a teacher (particularly a one-on-one aide) has merely spent time alone with a student.  The term "actual" in "actual knowledge" would seem to require more, and indeed, the case law cited by Plaintiffs does require more.  *See id.* at 398 (finding actual knowledge where the district was aware that a teacher had given a student presents, behaved in a sexually suggestive manner with her, written her an inappropriate letter, and called her at home); *Hart v. Paint Valley Local Sch. Dist.*, No. C2-01-004, 2002 WL 31951264, at *6 (S.D. Ohio Nov. 15, 2002) ("[T]he actual notice standard is met when an appropriate official has actual knowledge of a substantial risk of abuse to children in the school based on prior complaint of other students."); *Doe v. Sch. Admin. Dist. No. 19*, 66 F. Supp. 2d 57, 63 (D. Me. 1999) (finding the actual notice standard is met when a school official was notified that the accused teacher had had sexual relations with a student other than the plaintiff); *Doe v. Taylor Indep. Sch. Dist.*, 15 F.3d 443, 456 (5th Cir. 1994) (concluding the District had notice of harassment after school officials had received several reports of inappropriate conduct by the accused teacher with multiple female students).

751 ("Deliberate indifference may be found both when the defendant's response to known discrimination is clearly unreasonable in light of the known circumstances, and when remedial action only follows after a lengthy and unjustified delay." (internal quotation marks and citations omitted)).  Because there is a genuine issue of material fact as to whether the District had actual notice of the alleged abuse and as to whether the District was deliberately indifferent to the alleged abuse, summary judgment on Plaintiffs' Title IX claims is not appropriate.

### D.  Count III (Substantive Due Process) (all Defendants but the Town)

Plaintiffs next assert that Defendants are liable for violations of his substantive due process rights under the Fourteenth Amendment resulting from their failure to adequately supervise Mr. Hasak and to "take the minimum steps necessary to protect Student from harm" and their failure to "provide necessary staff training on how to evaluate and handle a complaint of abuse reported by a severely disabled student."  (Fifth Am. Compl. ¶ 80.)

"To state a cause of action under § 1983 for violation of the Due Process Clause, plaintiffs must show that they have asserted a recognized 'liberty or property' interest within the purview of the Fourteenth Amendment, and that they were intentionally or recklessly deprived of that interest, even temporarily, under color of state law."  *Doe v. Taylor Indep. Sch. Dist.,* 15 F.3d 443, 450 (5th Cir. 1994) (internal quotation marks and citations omitted).  The Second Circuit has recognized that the right to bodily integrity is a liberty interest protected by the Fourteenth Amendment, "'that bodily integrity is necessarily violated when a state actor sexually abuses a schoolchild,'" and that in this

31

context, a school employee is a "state actor."[13] *United States v. Giordano*, 442 F.3d 30, 47 (2d Cir. 2006) (quoting *Taylor Indep. Sch. Dist.*, 15 F.3d at 451–52).   Thus, if John was sexually abused by Mr. Hasak, and there is clearly a genuine dispute of material fact as to whether he was, Mr. Hasak is liable for violating John's Fourteenth Amendment right to bodily integrity.   The question then becomes whether the other Defendants may also be held liable for that alleged violation.

### 1.   Board of Education

"Municipal entities, including school districts, are 'persons' within the meaning of § 1983 and [are] therefore subject to suit under that provision." *Nagle v. Marron,* 663 F.3d 100, 116 (2d Cir. 2011).   School districts, like municipalities, however, are "not liable on a *respondeat superior* theory, simply because an employee committed a tort." *Romero v. City of New York*, 839 F. Supp. 2d 588, 617 (E.D.N.Y. 2012) (internal quotation marks omitted).   Rather, a municipal entity "may be held liable under § 1983" only if the plaintiff can "demonstrate[] that the constitutional violation complained of was caused by a municipal 'policy or custom.'" *Vassallo v. Lando*, 591 F. Supp. 2d 172, 201 (E.D.N.Y. 2008) (quoting *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694–95 (1978)).   A "policy or custom" can be inferred from the existence of:

> (1) a formal policy officially endorsed by the municipality; (2) actions taken by government officials responsible for establishing the municipal policies that caused the particular deprivation in question; (3) a practice so consistent and widespread that it constitutes a custom

---

[13] To the extent Defendants argue that the abuse alleged here does not rise to the level of a constitutional violation, they are incorrect as a matter of law.   The Second Circuit has clearly held that abuse by a school employee of a child violates the child's right to bodily integrity.   *See Giordano*, 442 F.3d at 47.

or usage sufficient to impute constructive knowledge of the practice to policymaking officials; or (4) a failure by policymakers to train or supervise subordinates to such an extent that it amounts to deliberate indifference to the rights of those who come into contact with the municipal employees.

*Romero*, 839 F. Supp. 2d at 618 (internal citations omitted).  Additionally, a "custom or policy" may be inferred from evidence that a municipal entity "had notice of but failed to make any meaningful investigation into charges of misconduct by lower-level employees."  *Doe v. City of New York*, No. 09 CIV. 9895 (SAS), 2013 WL 796014, at *3 (S.D.N.Y. Mar. 4, 2013) *aff'd*, 558 F. App'x 75 (2d Cir. 2014).

Plaintiffs make four claims: (1) the BOE had notice of but failed to make any meaningful investigation into charges of misconduct by lower-level employees, (2) the BOE failed to adequately train employees regarding how to evaluate and handle a complaint of abuse reported by a severely disabled student, (3) the BOE failed to adequately supervise Mr. Hasak to ensure that he was not left alone with John for long stretches of time, and (4) the BOE manifested deliberate indifference in hiring Mr. Hasak "without any semblance of due diligence in the hiring process."  (Defs.' Mem. Supp. Mot. to Dismiss [Doc. # 326-1] at 31–33.)

### a.  Actual Notice

Summary judgment is not warranted on the first claim (that the BOE had notice of but failed to investigate the alleged abuse) because, as concluded earlier, a reasonable jury could find that the District knew John had made allegations against Mr. Hasak prior to October 15, 2009.

### b.  Failure to Train

Summary judgment is however warranted on Plaintiffs' second claim (that the BOE failed to adequately train employees regarding how to handle a complaint of abuse by a severely disabled student).  The Second Circuit has "described three requirements for showing that a lack of training manifests deliberate indifference." *Green v. City of New York*, 465 F.3d 65, 80 (2d Cir. 2006) (citing *Walker v. City of New York*, 974 F.2d 293, 297–98 (2d Cir. 1992)).

> First, to reach the jury, the plaintiff must offer evidence from which a reasonable jury could conclude that a policy-maker knows to a moral certainty that her employees will confront a given situation.  Next, the plaintiff must show that the situation either presents the employee with a difficult choice of the sort that training or supervision will make less difficult or that there is a history of employees mishandling the situation.  Finally, the plaintiff must show that the wrong choice by the city employee will frequently cause the deprivation of a citizen's constitutional rights.  In addition, at the summary judgment stage, plaintiffs must identify a specific deficiency in the city's training program and establish that that deficiency is closely related to the ultimate injury, such that it actually caused the constitutional deprivation.

*Id.* at 80–81 (internal quotation marks and citations omitted).  Here, Plaintiffs have offered no evidence that the District knew "to a moral certainty" that employees would need to know how to handle allegations of abuse specifically brought by a severely disabled child.[14]  Plaintiffs' allegation at oral argument that the District should have known of this need because of the "context of the world we live in today" (specifically

---

[14] There does not appear to be any dispute that the District provided training to at least certified staff regarding child abuse generally and reporting requirements for teachers who learn about child abuse, but the District did not provide training on abuse of disabled students specifically.

citing the sexual abuse scandals in the Catholic Church and sexual abuse of children by Jerry Sandusky) is insufficient to satisfy this standard.   In spite of the high profile incidents cited by Plaintiffs, the need for training alleged here, unlike, for example, a city's failure to train armed police officers on constitutional limitations on the use of deadly force, cannot "be said to be 'so obvious' that failure to do so could properly be characterized as 'deliberate indifference' to constitutional rights."   *City of Canton*, 489 U.S. at 390 n.10.  Plaintiffs' failure to train claim against the BOE thus fails as a matter of law.

### c.   Failure to Supervise

Plaintiffs' failure to supervise claim fares no better.  As with failure to train claims, plaintiffs alleging a failure to supervise by a municipal entity must: "(1) establish state defendants' duty to act by proving they should have known their inadequate supervision was so likely to result in the alleged deprivations so as [to] constitute deliberate indifference under *Walker*; (2) identify obvious and severe deficiencies in the state defendants' supervision that reflect a purposeful rather than negligent course of action; and (3) show a causal relationship between the failure to supervise and the alleged deprivations to plaintiffs."  *Reynolds v. Giuliani*, 506 F.3d 183, 193 (2d Cir. 2007).  Here, Plaintiffs have not established the BOE should have known that permitting Mr. Hasak to be alone with John "was so likely to result in the alleged deprivations" as to constitute "deliberate indifference" by the Board.

In support of his claim, Plaintiffs point to a series of emails between Ms. Bellino, Ms. Schultz, Ms. Cunha, and Ms. Fisher in March 2008 in which Ms. Bellino states that Robin Pavia (Director of Special Education and Student Services) had required "that a

certified staff" be with Mr. Hasak "at all times," and that Mr. Hasak could "not be in there by himself." (Ex. K to Pls.' 56(a)2.) However, these emails (even if admissible) do not show that the BOE knew or should have known that permitting Mr. Hasak to be alone with John would very likely result in Mr. Hasak's alleged abuse of John.[15] Because Plaintiffs have failed to establish the first element of a failure to supervise claim, summary judgment is granted with respect to this claim.

### d. Deliberate Indifference in Hiring

Finally, Plaintiffs argue that the BOE exhibited deliberate indifference in hiring Mr. Hasak, "Pavia's nephew, . . . without any semblance of due diligence in the hiring process." (Opp'n at 33.) Ms. Pavia testified that she had conducted the interviews and had checked references for candidates for the paraprofessional position for which Mr. Hasak was ultimately hired. (Pavia Dep. at 25.) She admitted that Mr. Hasak was the only candidate whom she interviewed, that she recommended that Mr. Hasak be hired without disclosing that he was her nephew, and that although she had checked three of his professional references, she did not check any of his personal references. (*Id.* at 25–

---

[15] Plaintiffs contend that Ms. Pavia's directive that Mr. Hasak not be left alone with John demonstrates that Defendants "*did* suspect that something 'was wrong' with John being taken to a room alone with Hasak." (Opp'n at 34 (emphasis in original).) The flaw in this argument is that there are many reasons that the District might not have wanted Mr. Hasak to be alone with John other than knowledge that Mr. Hasak was likely to abuse John. John was for example, known to throw things, and for safety reasons, the District may have wanted two adults to be with him. In addition, Mr. Hasak was not a teacher, and so during the time he was alone with John, John was not being educated. Simply demonstrating that the District did not want John left alone with Mr. Hasak does not show that the District knew it was very likely Mr. Hasak would abuse John if left alone with him.

27, 97–98.)   However, these admissions are not enough to create a genuine issue of material fact sufficient to preclude summary judgment on this claim.

In order to prevail on a § 1983 claim with regard to hiring, "[a] plaintiff must demonstrate that a municipal decision [to hire an individual] reflects deliberate indifference to the risk that a violation of a particular constitutional or statutory right will follow the decision." *Bd. of Cnty. Comm'rs of Bryan Cnty., Okl. v. Brown*, 520 U.S. 397, 411 (1997). "Only where adequate scrutiny of an applicant's background would lead a reasonable policymaker to conclude that the plainly obvious consequence of the decision to hire the applicant would be the deprivation of a third party's federally protected right can the official's failure to adequately scrutinize the applicant's background constitute 'deliberate indifference.'" *Id.*

Here, as in *Brown*, there is no allegation that the municipal entity (the BOE) had a policy of failing to screen applicants.   Rather, Plaintiffs, like Brown, seek to hold the municipal entity liable based on a supervisor's single act of allegedly failing to properly screen a candidate's background.   Like Brown, however, Plaintiffs have failed to demonstrate that "a full review of the candidate, [Mr. Hasak's,] record reveals that [the District] should have concluded that [the candidate's alleged constitutional deprivation] would be a plainly obvious consequence of the hiring decision." *Id.* at 412–13.   Simply put, Plaintiffs have pointed to nothing in Mr. Hasak's record that clearly should have alerted the District that he was likely to abuse John.   Plaintiffs' conceded as much at oral argument when they admitted that they "do not know" if greater scrutiny of Mr. Hasak's application would have revealed any different information about him.   Summary judgment is therefore warranted on this claim.

37

### 2. Cunha, Conte, Bellino, and Pavia

Plaintiffs allege that the individual Defendants, Ms. Cunha, Ms. Conte, Ms. Bellino, and Ms. Pavia, are also liable for Mr. Hasak's alleged violations of John's substantive due process right to bodily integrity.  "An individual cannot be held liable for damages under § 1983 merely because he held a high position of authority, but can be held liable if he was personally involved in the alleged deprivation."  *Back v. Hastings On Hudson Union Free Sch. Dist.*, 365 F.3d 107, 127 (2d Cir. 2004) (internal quotation marks omitted).  Personal involvement can be shown by

> evidence that: (1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference . . . by failing to act on information indicating that unconstitutional acts were occurring.

*Id.*  Plaintiffs appear to raise several claims against Defendants: that (1) Defendants Cunha, Conte, and Bellino[16] failed to act on information indicating that unconstitutional acts were occurring, and (2) Defendants Cunha, Conte, Bellino, and Pavia were grossly negligent in supervising Mr. Hasak.

Summary judgment is granted on the first claim as to Defendant Cunha but denied as to Defendants Bellino and Conte because as discussed above,[17] there is a

---

[16] The Court presumes this claim refers to these Defendants only and not to Ms. Pavia since there is no allegation that John told Ms. Pavia that he was being abused.

[17] *See supra* Part II.A.4.a.

genuine issue of material fact as to whether Ms. Bellino and Ms. Conte had notice of the abuse but no reasonable juror could find that Ms. Cunha had notice.  Summary judgment is granted as to all Defendants on the second claim.  It is not clear from the record which Defendants were actually responsible for supervising Mr. Hasak, but even if each Defendant was responsible for supervising him, Plaintiffs have not set forth facts sufficient to even create a genuine issue of material fact.  In order to prevail on a gross negligence theory, a "[p]laintiff[ ] must establish [defendant's] deliberate indifference by showing that 'the need for more or better supervision to protect against constitutional violations was obvious,' but that [defendant] made 'no meaningful attempt' to forestall or prevent the unconstitutional conduct."  *Atwood v. Town of Ellington*, 468 F. Supp. 2d 340, 354 (D. Conn. 2007) (alterations in original) (quoting *Amnesty Amer. v. Town of West Hartford*, 361 F.3d 113, 127 (2d Cir. 2004)).  As discussed above, Plaintiffs have adduced no evidence to show that it was obvious that permitting Mr. Hasak to be alone with John for short periods of time would result in Mr. Hasak's alleged abuse of John.

### E.   Count IV (Procedural Due Process) (BOE only)

Plaintiffs contend that the BOE violated their procedural due process rights by permitting Mr. Hasak to return to work as a full-time employee in the Darien public schools "without giving appropriate consideration to the Student's report that he had been sexually abused, and without giving the Parents an opportunity to participate in the proceedings that led to the determination that Hasak had not abused the Plaintiff Student."  (Fifth Am. Compl. ¶ 88.)

"When reviewing alleged procedural due process violations, the Supreme Court has distinguished between (a) claims based on established state procedures and (b) claims

based on random, unauthorized acts by state employees.  In the latter case, the Due Process Clause of the Fourteenth Amendment is not violated when a state employee intentionally deprives an individual of property or liberty, so long as the State provides a meaningful postdeprivation remedy." *Hellenic Am. Neighborhood Action Comm. v. City of New York*, 101 F.3d 877, 880 (2d Cir. 1996) (internal citations omitted).  At oral argument, Plaintiffs alleged that John's liberty interest in bodily integrity was intentionally violated by Mr. Hasak, a municipal employee, and the BOE failed to provide a meaningful post-deprivation remedy.[18]  Specifically, Plaintiffs protest the BOE's alleged failure to give appropriate consideration to John's report of abuse and the BOE's failure to permit John's parents to participate in the investigation into John's claims.  (Fifth Am. Compl. ¶ 88.)

There is little caselaw defining the contours of a "meaningful postdeprivation remedy," but it seems clear that the availability of an administrative hearing generally suffices.  *See Hilfiger v. Alger*, 582 F. Supp. 2d 418, 429 (W.D.N.Y. 2008) *aff'd*, 387 F. App'x 111 (2d Cir. 2010) (holding that the availability of an administrative hearing, even where the plaintiff fails to avail herself of it, satisfies the requirement of adequate post-deprivation remedies (citing *Fetto v. Sergi*, 181 F. Supp. 2d 53, 82 (D. Conn. 2001) ("the fact that the plaintiff was provided with a postdeprivation remedy in the form of [an] administrative hearing . . . , and the fact that he has not shown by a preponderance of the evidence that this remedy was not meaningful, indicates that his due process rights were

---

[18] Defendants read the complaint as alleging a claim based on established state procedures.  To the extent Plaintiffs make such a claim, they fail to identify the liberty or property interest of which they claim they were deprived when the Board ended Mr. Hasak's suspension and placed him at a different school.

not violated"); *Dworkin v. City of New York*, No. 95 Civ. 10261, 1996 WL 673815, at *4 (S.D.N.Y. Nov. 20, 1996) ("plaintiff's failure to make any request for a . . . hearing obviates the need for such a hearing"))).  Here, although as Plaintiffs note, they "did not have an administrative hearing on the sexual abuse that John endured" (Opp'n at 35), such a hearing was available to them; they chose to waive it (*see* Mediation Agreement ¶ 13 ("The Parties agree this Agreement provides all the relief the Parents could have obtained from the Board in an administrative hearing under the IDEA to remedy the impact of the alleged abuse."))).[19]  As such, summary judgment is granted on this claim.

### F.   Count VII (Negligence) (all Defendants but the Town)

In Count VII, Plaintiffs assert that Defendants are liable for negligence arising out of their failure to adequately supervise Mr. Hasak, their failure to train staff on the dangers of sexual abuse of disabled students, their failure to adequately assess Mr. Hasak's qualifications before hiring him, in hiring Mr. Hasak.  (Opp'n at 37.) However, as Defendants contend, "this claim is barred by the doctrine of governmental immunity." (Mem. Supp. at 35.)

"At common law, municipalities were generally immune from tort liability. Connecticut General Statutes section 52–557n abrogates that common law immunity by providing for municipal liability based on the negligent acts [or omissions] of an employee acting within the scope of employment." *Doe v. Darien Bd. of Educ.*, No. 3:05-

---

[19] Defendants argue in a footnote that Plaintiffs waived their right to bring this and other claims in the Mediation Agreement.  (Mem. Supp. at 16 n.1.)  At oral argument, Defendants clarified that their waiver argument is limited to Plaintiffs' due process claims.  Because the Court has determined that Plaintiffs' claim lacks merit, it need not reach the waiver issue.

CV-482 (WWE), 2009 WL 369918, at *4 (D. Conn. Feb. 11, 2009) (internal citations omitted).  However, the statute preserves municipal immunity for claims arising out of "negligent acts or omissions which require the exercise of judgment or discretion as an official function of the authority expressly or impliedly granted by law."  Conn. Gen. Stat. 52-557n(a)(2)(B).  Similarly, although municipal employees "may be liable if [they] misperform[] a ministerial act"—that is, an act the employee has a duty to perform "in a prescribed manner without the exercise of judgment or discretion"—they have "qualified immunity" for discretionary governmental acts performed wholly for the benefit of the public.  *Evon v. Andrews*, 211 Conn. 501, 505 (1989).[20]

"[E]xtensive and near-unanimous precedent in Connecticut clearly demonstrates that the acts or omissions alleged in plaintiff's complaint—the failure to screen, hire, train, supervise, control and discipline—are discretionary acts as a matter of law." *Hughes v. City of Hartford*, 96 F. Supp. 2d 114, 119 (D. Conn. 2000) (collecting cases); *see Jarry v. Southington Bd. of Educ.*, No. 3:08CV954 (WWE), 2009 WL 179817, at *2 (D. Conn. Jan. 22, 2009) ("Connecticut precedent demonstrates that acts or omissions concerning the supervision, control and discipline of employees are discretionary acts as a matter of law."); *Doe v. Board of Education of the City of New Haven,* 76 Conn. App. 296, 300 (2003) ("[T]he duty of the defendant to supervise students is a discretionary, governmental duty.").  Therefore, Defendants are entitled to qualified immunity on

---

[20] The Connecticut Supreme Court has "recognized an exception to discretionary act immunity that allows for liability when the circumstances make it apparent to the public officer that his or her failure to act would be likely to subject an identifiable person to imminent harm." *Haynes v. City of Middletown*, 314 Conn. 303, 312 (2014).  However, Plaintiffs do not argue that this exception applies here.

Plaintiffs' negligence claims, and summary judgment is granted in Defendants' favor on Count VII (except as to Defendant Hasak who has not joined this motion for summary judgment).

### G.  Counts VIII and IX (Indemnification) (Town of Darien & BOE)

In Counts VIII and IX Plaintiffs seek to require the Town of Darien (Count VIII) and the BOE (Count IX) to indemnify the individual Defendants.  Defendants contend that summary judgment is warranted on these claims because it is warranted on each of the underlying substantive claims.  However, as summary judgment is not warranted on each of the underlying substantive claims, this argument fails.

Defendants next argue that Count VIII should be dismissed because the Town is not a proper defendant.  Defendants are correct.  Conn. Gen. Stat. § 7–465 provides that a municipality must indemnify its employees for any liability they incur when acting in the course of their employment.  Here, Plaintiffs admit that the individual Defendants are employees of the Board of Education and not the Town.  (*See* Pls.' 56(a)2 Stmt. ¶ 1 (admitting that the named individual defendants were employees of the Darien Board of Education and not the Town of Darien but averring that the Town of Darien funds and otherwise is empowered to effectively exercise a great deal of fiscal and management control over the Darien Board of Education).)  As such, summary judgment is granted in Defendants' favor on Count VIII.[21]

---

[21]  Additionally, the Court notes that Plaintiffs fail to oppose Defendants' arguments on this count.  "Federal courts may deem a claim abandoned when a party moves for summary judgment on one ground and the party opposing summary judgment fails to address the argument in any way." *Taylor v. City of New York,* 269 F. Supp. 2d 68, 75 (E.D.N.Y. 2003).

## III.   Conclusion

For the foregoing reasons, Defendants' Motion [Doc. # 326] is GRANTED in part and DENIED in part.

The motion is granted as to: Count III (substantive due process) against the BOE on the failure to train, failure to supervise, and deliberate indifference in hiring claims, against Defendants Pavia and Cunha on all claims, and against Defendants Conte and Bellino on the gross negligence claim; Count IV (procedural due process); Count VII (negligence) as to all Defendants except Mr. Hasak; and Count VIII (indemnification). As such, the following Defendants are dismissed from the case: the Town of Darien, Robin Pavia, and Andrea Cunha.  The Clerk is directed to amend the caption accordingly.

The motion is denied as to: Count I (ADA & Rehabilitation Act); Count II (Title IX); Count III (substantive due process) against the BOE on the actual notice claim and against Defendants Bellino and Conte on the failure to act claim; and Count IX (indemnification).  Additionally, as stated above, Plaintiffs' Motion [Doc. # 366] to Strike Exhibit 6 is GRANTED.

IT IS SO ORDERED.

_____/s/_____

Janet Bond Arterton, U.S.D.J.

Dated at New Haven, Connecticut this 21st day of May, 2015.